# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

KANDI K. KNIGHT,         )
                                )
    **Plaintiff,**             )
                                )
    **v.**                      )      **CAUSE NO. 1:09-CV-00098**
                                )
**MICHAEL J. ASTRUE,**     )
**Commissioner of Social Security,**  )
                                )
    **Defendant.**           )

## OPINION AND ORDER

Plaintiff Kandi Knight appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]

(*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Knight applied for DIB on October 9, 2002, alleging that she became disabled on July 12,

2002. (Tr. 80-81.)  The Commissioner denied her application initially and upon reconsideration,

and Knight did not appeal the reconsideration denial. (Tr. 47-48, 60-61, 64-67.)

Knight then filed a new application for DIB on March 6, 2006, again alleging disability

as of July 12, 2002. (Tr. 75-76.)  Her date last insured for DIB was December 31, 2007 (Tr. 69),

so she must establish that she was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d

1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that she was disabled as of

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

her date last insured in order to recover DIB benefits). The Commissioner denied her application initially and upon reconsideration but this time Knight requested a hearing. (Tr. 45-46, 52-53, 56-59.) On April 30, 2008, Administrative Law Judge ("ALJ") Terry Miller conducted a hearing at which Knight (who was represented by counsel), her father, and a vocational expert testified. (Tr. 381-415.)

On September 17, 2008, the ALJ rendered an unfavorable decision to Knight, concluding that she was not disabled despite the limitations caused by her impairments because she could perform a significant number of other jobs in the economy. (Tr. 11-28.) The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-6.)

Knight filed a complaint with this Court on April 17, 2009, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Knight alleges just one flaw with the Commissioner's final decision—that the ALJ improperly evaluated the opinion of her treating psychiatrist, Dr. Smith. (Opening Br. of Pl. in Social Security Appeal ("Opening Br.") 15-18.)

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of her date last insured, Knight was forty-five years old; had a high school education and had attended two semesters of technical school; and possessed twenty years of work experience, primarily as a certified nurse's assistant or home health aide. (Tr. 75, 80, 101, 147, 152, 387-89.) Knight alleges that she became disabled due to bipolar disorder, borderline

---

[2] The administrative record in this case is voluminous (415 pages). Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

personality disorder, and dependant personality disorder. (Opening Br. 2-3.)

At the time of the hearing, Knight lived with her husband in a one-story home.[3] (Tr. 386-87.)  She stated that she last worked in 2002 and that she quit because she was under a lot of stress. (Tr. 388-89.)  She explained that the stress she felt while she was working resulted in several inpatient hospitalizations but that she had not been hospitalized since she stopped working. (Tr. 390, 393.)  Knight stated that she got along with most of her coworkers and supervisors, but she "never liked being told what to do." (Tr. 393) ("Being told what to do and being told to do it at a fast pace.  I just could not do that.").)

When asked about her limitations, Knight stated that she has trouble concentrating and with her memory. (Tr. 390.)  Knight reported that her current medications help her with these symptoms and that she experiences no side effects from them other than a slight tremor in her right hand, which sometimes makes her drop things. (Tr. 394, 408.)  She also stated that she suffers from headaches one to two times per week. (Tr. 295-96.)

As to her daily routine, Knight testified that walks one-quarter of a mile to the post office in the morning and often walks another mile in the afternoon. (Tr. 396-97.)  She takes care of her two cats; performs household chores such as laundry, dusting, cooking, and vacuuming; and gets groceries and gas for the car. (Tr. 397, 400.)  She is independent with her self care and drives a car four to five time a week. (Tr. 398, 400.)  For leisure, she enjoys walking, reading books and newspapers, working word puzzles, watching television, and flower gardening. (Tr. 397-99, 404, 406.)  When performing household tasks, Knight confided that she has to "go at a slow pace".

---

[3] Knight's husband also testified at the hearing, essentially corroborating her complaints that she has concentration problems, moves slowly, and "doesn't work well when she is up against the clock." (Tr. 409-10.)

(Tr. 401, 403.)  She regularly socializes with friends and attends church every other week. (Tr. 395.)

## B.  Summary of the Medical Evidence

Between 1981 and 1996, Knight was hospitalized approximately eight times due to symptoms of mental illness, and she was diagnosed with bipolar disorder. (Tr. 182.)

In October 1996, Knight was hospitalized at Parkview Hospital with a diagnosis of bipolar disorder, most recent episode manic, and a notation of severe marital distress. (Tr. 173-75.)  Dr. Jay Fawver, her treating psychiatrist for almost seventeen years, noted that she had been compliant with her Lithium regimen for the past ten years. (Tr. 173.)  He adjusted her medications. (Tr. 174.)  He rated her Global Assessment of Functioning ("GAF") at 70 upon discharge and 80 for the past year.[4] (Tr. 174.)

Almost two years later, in October 1996, Knight was admitted to the Bowen Center due to bizarre behavior, admitting that she had been reducing her medication on her own. (Tr. 179-

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 0 to 10 reflects a persistent danger of severely hurting self or others, a persistent inability to maintain minimal personal hygiene, or a serious suicidal act with clear expectation of death. *Id.* A GAF score of 11 to 20 is indicative of some danger of hurting self or others, an occasional failure to maintain personal hygiene, or a gross impairment in communication. *Id.* A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id.* A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* A GAF score of 61 to 70  reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*  And, a GAF score of 71 to 80 is indicative of transient symptoms that are expectable reactions to psychosocial stressors or no more than a slight impairment in social, occupation, or school functioning. *Id.*

81.)  On initial mental status exam, she was positive for rapid and pressured speech, psychomotor hyperactivity, flight of ideas, euphoric mood, elated affect, moderately impaired concentration, and recent impaired judgment. (Tr. 179.)  After trial of various medications, Knight began to improve slowly but steadily. (Tr. 179.)  Diagnosis was bipolar disorder, manic severe without psychotic features. (Tr. 179.)  Her GAF was rated at 10 upon admission, 20 upon discharge, and 50 for the past year. (Tr. 179.)

About a week later, on June 30, 2000, Knight was again admitted to the hospital due to displaying catatonic symptoms. (Tr. 212-16.)  She was unable to cooperate with a mental status exam upon admission due to the severity of her symptoms. (Tr. 212.)  She was offered electroconvulsive therapy, but refused. (Tr. 212.)  Knight was hospitalized for over four weeks for medication management. (Tr. 212.)  Upon discharge, she reported that she "felt fine". (Tr. 212.)  Her GAF score upon discharge was 65 and her diagnosis was bipolar disorder, type I, and borderline personality trait. (Tr. 212.)

On August 15, 2000, Knight reported to Dr. Fawver that she was "doing real good". (Tr. 292.)  In November 2000, she stated that she was "great". (Tr. 289.)  In February 2001, Dr.

5

81.)  On initial mental status exam, she was positive for rapid and pressured speech, psychomotor hyperactivity, flight of ideas, euphoric mood, elated affect, moderately impaired concentration, and recent impaired judgment. (Tr. 179.)  After trial of various medications, Knight began to improve slowly but steadily. (Tr. 179.)  Diagnosis was bipolar disorder, manic severe without psychotic features. (Tr. 179.)  Her GAF was rated at 10 upon admission, 20 upon discharge, and 50 for the past year. (Tr. 179.)

Another two years later, in June 2000, Knight was hospitalized for several days due to escalating manic symptoms and the need to adjust her medication. (Tr. 195-98.)  She had gotten married two days previously and had been reducing her medication over the past few months under the supervision of her physician with the hope of discontinuing the Lithium. (Tr. 195.)  She reported significant improvement the day after admission and after receiving increased medication. (Tr. 197.)  Her GAF score upon discharge was 65, and her diagnosis was bipolar affective disorder, type I, and dependent personality disorder. (Tr. 195.)

About a week later, on June 30, 2000, Knight was again admitted to the hospital due to displaying catatonic symptoms. (Tr. 212-16.)  She was unable to cooperate with a mental status exam upon admission due to the severity of her symptoms. (Tr. 212.)  She was offered electroconvulsive therapy, but refused. (Tr. 212.)  Knight was hospitalized for over four weeks for medication management. (Tr. 212.)  Upon discharge, she reported that she "felt fine". (Tr. 212.)  Her GAF score upon discharge was 65 and her diagnosis was bipolar disorder, type I, and borderline personality trait. (Tr. 212.)

On August 15, 2000, Knight reported to Dr. Fawver that she was "doing real good". (Tr. 292.)  In November 2000, she stated that she was "great". (Tr. 289.)  In February 2001, Dr.

Fawver noted that Knight's mood was stable with no problems and that she was sleeping well. (Tr. 290.)  In June 2001, Knight again reported that she was "great". (Tr. 289.)  In February 2002, Knight told Dr. Fawver that she was "good" and that her moods were staying level. (Tr. 288.)

However, on July 15, 2002, Knight was re-admitted to the hospital for mental distress and was treated for the first time by Dr. Don Smith, a psychiatrist at Parkview. (Tr. 227-30.)  He found her to be depressed and irritable, and diagnosed her with bipolar disorder with psychosis. (Tr. 227.)  Dr. Smith noted her long history of cycling psychotic bipolar episodes every two years. (Tr. 227.)  He was able to bring her out of the acute psychotic episode within 24 hours, though her residual symptoms required "quite a bit of medication management". (Tr. 227.)  She was discharged approximately two weeks later to a partial program. (Tr. 227.)  At this point, Knight and her husband decided that the stressors of employment were too much for her to handle, and she left her job. (Tr. 232.)

Following her hospitalization, Dr. Smith treated Knight on an outpatient basis.  On September 22, 2002, Dr. Smith noted that Knight's speech was loud and rapid, but that her mental status was the best he had seen it. (Tr. 286.)  He adjusted her Lithium. (Tr. 286.)  On October 3, 2002, Dr. Smith penned a note "To Whom It May Concern" stating that Knight was "unable to work at this time." (Tr. 285.)  He saw her again on November 4, 2002, noting that she was experiencing a "remarkable remission" from a particularly severe type of bipolar disorder with psychosis. (Tr. 283.)  He thought that Knight was a "pharmacologic challenge" in that she needed quite a bit of medication to function, but also that according to her and her husband, she was functioning at her best at this time. (Tr. 283.)  Therefore, he made no major adjustments to

her medication. (Tr. 283.) Dr. Smith saw Knight again on December 11, 2002, and since he was soon leaving his position at Parkview, her transferred her to the care to Dr. Kevin Murphy, another psychiatrist at Parkview. (Tr. 280.)

On December 16, 2002, Knight underwent a psychological evaluation by Dr. Kenneth Bundza at the request of the Social Security Administration. (Tr. 342-45.) She reported that she was "quite independent in both personal and household" daily tasks and was currently involved in a variety of holiday-related activities. (Tr. 343.) Although Dr. Bundza found that Knight appeared to be slightly tense, he did not observe any signs of depression or mania. (Tr. 343.) On mental status exam, Knight did well on tests of short-term memory and attention span, and had no deficits in judgment, common sense, or abstract reasoning ability. (Tr. 343.) He found no evidence of an intellectual or cognitive impairment. (Tr. 345.) He diagnosed her with bipolar I disorder, most recent episode depressed, moderate, and assigned her a current GAF of 75. (Tr. 345.) He assessed her prognosis as "fair" if she continued to take her medication and participate in treatment. (Tr. 345.)

On January 8, 2003, Dr. W. Shipley, a state agency psychologist, reviewed her record and determined that she did not have a severe mental impairment, finding only mild limitations in activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence, or pace. (Tr. 346-59.) In reaching his conclusion, Dr. Shipley reasoned that Dr. Bundza had found that Knight had no limitations in adaptive functioning, was quite stable, could perform many household activities, and had a long work history despite her bipolar symptoms. (Tr. 358.) Thus, he found Knight capable of performing "simple tasks." (Tr. 358.) A second state agency psychologist later affirmed Dr. Shipley's opinion. (Tr. 346.)

On January 29, 2003, Mary Patalita, a nurse at Parkview Behavioral Health, provided a letter "To Whom It May Concern" advocating for Knight's DIB benefits. (Tr. 279-81.) She stated that Knight had been treated by Parkview since 1985 and that she had been unable to work since 2002 due to intermittent manic episodes, which are psychotic and resistant to treatment. (Tr. 279.) She found that Knight was reasonably stable at that time but that the stress of returning to work could exacerbate her condition. (Tr. 279.)

In April 2003, Knight reported to Dr. Murphy that she was feeling "real good" with no mood swings, anxiety, depression, or insomnia. (Tr. 278.) Likewise, in July and November 2003, Knight told Dr. Murphy that she was feeling "good". (Tr. 277-78.) Similarly, in March, July, and October 2004, Knight consistently reported to Dr. Murphy that she was doing well and that she had no depression, irritability, or anxiety. (Tr. 273.) Again, in February and June 2005, Knight stated that she felt fine and was doing well. (Tr. 271-72.) However, in October 2005, Dr. Murphy noted that Knight had some increased irritability. (Tr. 270.) In February 2006, Dr. Murphy documented that Knight's mood was pretty good though she had some irritability. (Tr. 269.) She told Dr. Murphy that she was seeking DIB and requested a letter in support; he declined to do so, advising her to seek an independent evaluation. (Tr. 269.)

On May 7, 2006, Sherwin Kepes, Ph.D., examined Knight at the request of the Social Security Administration. (Tr. 264-67.) On mental status exam, Dr. Kepes observed that Knight was in no significant emotional distress; was cooperative; and displayed adequate memory, judgment, and common sense. (Tr. 265-66.) He concluded that she did not have any difficulties of a cognitive nature. (Tr. 267.) He further observed that she was stable on her current medication regimen and that she was aware she needed to continue it. (Tr. 267.) Dr. Kepes

diagnosed Knight with bipolar I disorder, most recent episode depressed, moderate, and assigned her a GAF score of 75. (Tr. 267.)

On May 10, 2006, Joelle Larson, Ph.D., a state agency psychologist, reviewed Knight's record and concluded that she did not have a severe mental impairment, finding only mild limitations in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 317.) Her reasoning for this finding was that Knight had not been hospitalized in the past four years, the current medications were helping, the mental status exam was normal, and she had a wide range of daily living activities and long work history. (Tr. 329.) Dr. Larson's opinion was later affirmed by a second state agency psychologist. (Tr. 331.)

In June 2006, Knight returned to Dr. Murphy and stated she was concerned about her Lithium level. (Tr. 268.) He noted that her moods and sleep were fine. (Tr. 268.) In October 2006, she told Dr. Murphy that she was stressed due to medical concerns, including a possible hysterectomy. (Tr. 363.)

In December 2006, Bryan Ciula, Ph.D., performed a psychological evaluation and a "Medical Source Assessment (Mental)" at the request of Knight's attorney. (Tr. 332-36.) He administered the MMPI, which revealed that Knight had adequate resources for coping with stressors, little evidence of current depression or anxiety, and an appropriately-contained energy level. (Tr. 335-36.) Dr. Ciula noted that the MMPI "profile contraindicates current major thought disorder". (Tr. 336.) He also documented that Knight was currently stable on her medication regimen. (Tr. 336.) Nonetheless, he checked every box on the Medical Source Assessment as "severe", opining that Knight could not perform *any* tasks related to

understanding; memory; concentration; persistence; social interaction; or adaption on a regular, reliable, or sustained schedule. (Tr. 332-33.) Dr. Ciula also opined that Knight's "history demonstrates a clear pattern where the job related stress associated with her attempts at employment precipitate episodes often accompanied by psychosis." (Tr. 336.)

In January 2007, Dr. Murphy observed that Knight was doing fine, despite being worried about her upcoming hysterectomy. (Tr. 362.) In May 2007, he noted that her moods were better and her sleep was good. (Tr. 361.) In October 2007, Dr. Murphy documented that her mood was stable, her sleep good, and there were no signs of side effects from her medication. (Tr. 360.) Though Knight thought that her Lithium level was too high, Dr. Murphy counseled her that it was within the therapeutic range. (Tr. 360.)

Knight returned to the care of Dr. Smith on November 6, 2007, complaining that Dr. Murphy had her Lithium level too high. (Tr. 371.) Dr. Smith, however, did not change her medications. (Tr. 372.) On mental status exam, she exhibited emotional lability, yet reported that she was feeling okay except for irritation and anger at Dr. Murphy. (Tr. 372.) Dr. Smith found that Knight was pleasant, alert and oriented, and not psychotic; demonstrated good judgment; and had not experienced any mood swings of major magnitude lately. (Tr. 372.) However, he assigned her a GAF score of 25. (Tr. 372.) He diagnosed her with bipolar disorder, type I, in partial remission. (Tr. 372.)

Dr. Smith saw Knight again in January 2008, and he observed that she exhibited more manic behavior than at her last visit. (Tr. 368.) He saw her again three months later, in April, and found that she had a labile affect and opined she should qualify for DIB. (Tr. 375.) On mental status exam, she appeared tremulous, depressed, and without insight. (Tr. 375.) He found

her to be very fragile with respect to mood destabilization, evidenced by her numerous hospitalizations. (Tr. 375.)  He thought Knight was on the line between depression she could handle and depression that might require more intervention. (Tr. 375.)

In June 2008, Dr. Smith completed a Medical Source Assessment form for Knight. (Tr. 377-78.)  He noted that she had mild limitations in understanding, remembering, and carrying out simple instructions; asking simple questions; and maintaining socially appropriate behavior. (Tr. 377-78.)  He opined that she had moderate limitations in understanding, remembering, and carrying out detailed instructions; making simple work-related decisions; working in proximity to others without distraction; sustaining ordinary routine without supervision; and interacting appropriately with the general public. (Tr. 377-78.)  He further represented that she had moderately-severe limitations in maintaining attention and concentration for extended periods of time; completing a work week without interruptions from psychologically-based symptoms and performing at a consistent pace without excessive rest periods; getting along with coworkers without distracting them or exhibiting behavioral extremes; and setting realistic goals or making plans independently of others. (Tr. 377-78.)  Dr. Smith based his assessment on the fact that Knight had severe psychotic episodes in the past and may well have future episodes. (Tr. 378.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

11

adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted).  The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to . . . last for a continuous period of not less than 12

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an

impairment that results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.

§ 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On September 17, 2008, the ALJ rendered his decision. (Tr. 11-28.) He found at step one of the five-step analysis that Knight had not engaged in substantial gainful activity from her alleged onset date through her date last insured. (Tr. 13.) At step two, he concluded that Knight had the following severe impairments: bipolar disorder, tremors of the right upper extremity, and a recent hysterectomy and hypothyroidism. (Tr. 13.) The ALJ then at step three determined that Knight's impairment or combination of impairments was not severe enough to meet a listing. (Tr. 13-14.) Before proceeding to step four, the ALJ found that Knight's subjective complaints were not credible (Tr. 19) and assigned her the following residual functional capacity ("RFC"):

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform light work . . . except as reduced by no constant use of the dominant right upper extremity, as reduced to simple, routine, repetitive tasks, as reduced by no fast-paced or strict production requirements where the work is inherently

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

goal-oriented, as reduced by few, if any, workplace changes; and as reduced by only occasional and brief interactions with others.

(Tr. 16.)

Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Knight was unable to perform her past relevant work as a certified nurse's assistant or home health care aide. (Tr. 26-27.) The ALJ concluded at step five, however, that she could perform a significant number of other jobs within the economy, including cleaner/housekeeper, bagger of garments, and inspector/hand packager. (Tr. 27.) Therefore, Knight's claim for DIB was denied. (Tr. 28.)

### C. The ALJ's Consideration of Dr. Smith's Opinion Is Supported by Substantial Evidence

Knight's sole argument on appeal is that the ALJ improperly evaluated the opinion of Dr. Smith, who saw her four times between July and December 2002 and three times between November 2007 and April 2008, and opined that she was disabled. In the end, the ALJ's consideration of Dr. Smith's opinion was extremely thorough, and Knight's arguments essentially amount to a plea to this Court to reweigh the evidence, a task which it cannot do.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002). In the event the treating physician's opinion is not well supported or is inconsistent with

14

other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore,"[a] claimant is not entitled to DIB simply because [her] treating physician states that [s]he is 'unable to work' or 'disabled.'" *Clifford*, 227 F.3d at 870. The determination of disability is reserved to the Commissioner. *Id*.; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1); SSR 96-5p. In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see also* 20 C.F.R. § 404.1527(e)(3); *Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006). "Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether the individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8. Nonetheless, "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p; *see also Frobes*, 2006 WL 3718010, at *8. "In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527(d) . . . ." SSR 96-5p.

Here, it is undisputed that the ALJ thoroughly considered Dr. Smith's medical records, including his April 2008 opinion that Knight was disabled and his June 2008 opinion (six months after her DIB insured status expired) that her mental limitations ranged from mild to moderately-severe. In fact, the ALJ penned *more than two pages* in total on Dr. Smith's records. (*See* Tr. 20, 21, 24-25.) Ultimately, however, the ALJ chose not to assign great weight to Dr. Smith's opinion, finding it inconsistent with Knight's other medical records over the past five years and internally inconsistent with some of Dr. Smith's own records and GAF score. (Tr. 25); *see* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

The ALJ explained that he discounted Dr. Smith's one-sentence statement in October 2002 that Knight was "unable to work" because Dr. Smith had only seen her one time since her July hospitalization and thus was hardly a "treating source", *see* 20 C.F.R. § 404.1527(d)(2) (explaining that the longer a physician has treated a claimant and the more times he has seen her, the more weight that will be applied to his opinion); *Windus v. Barnhart*, 345 F. Supp. 2d 928, 941 (E.D. Wis. Nov. 15, 2004) (discounting a physician's opinion proclaiming her disabled after just two examinations), and because at that visit he declared that she was "in remission". (Tr. 21.) He further observed that Dr. Smith's subsequent notes in November and December 2002 also did not identify any adverse observation or objective mental status findings to support his earlier cursory statement of disability, but instead referred to her "remarkable remission". (Tr. 21, 280, 283); *see* 20 C.F.R. § 404.1527(d)(3) (articulating that the more medical signs and laboratory findings a medical source presents to support his opinion, the more weight that will be assigned to that opinion). The ALJ also recognized that Dr. Smith's statement of disability in

October 2002 was penned on the heels of her July hospitalization, but that over the next five years Knight remained stable on medication without any episodes of decompensation. (Tr. 21); *see* 20 C.F.R. § 404.1527(d)(4) (stating that the more consistent an opinion is with the medical record as a whole, the more weight that will be given to that opinion).

As to Dr. Smith's 2007 to 2008 records, the ALJ explained that when Knight resumed her care with Dr. Smith in November 2007, he documented that she was in partial remission, was feeling okay except for some irritation with Dr. Murphy, had not had any mood swings of major magnitude lately, and had good judgment and a pleasant affect. (Tr. 24.) The ALJ then astutely pointed out that Dr. Smith's GAF score of 25, which is generally reflective of behavior considerably influenced by delusions, hallucinations, a serious impairment in communication or judgment, and an inability to function in almost all areas, was totally inconsistent with these clinical findings. (Tr. 24); *see Hofslien v. Barnhart*, 439 F.3d 735, 376 (7th Cir 2006) (explaining that a treating physician's opinion may be discounted if it is internally inconsistent); *Clifford*, 227 F.3d at 871. He further opined that Dr. Smith's 2008 opinion that Knight was disabled seemingly turned a blind eye to her more than twenty-year successful work history and the fact that she had been stable on her current medication regimen for five years without any episodes of decompensation. *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (stating that a treating physician's opinion may be discounted if it is inconsistent with other evidence of record).

Thus, as the ALJ saw it, Dr. Smith based his 2008 statement of disability primarily on Knight's past episodes of decompensation five years earlier, ignoring her stable status over the last five years. *See Stevenson*, 105 F.3d at 1155 (acknowledging that an ALJ is entitled to make

17

reasonable inferences from the evidence before him). And, of course, the ALJ correctly emphasized that Dr. Smith's statement of "disability" is an issue reserved to the Commissioner, and thus it is never entitled to special weight or significance. *See* 20 C.F.R. § 404.1527(e); SSR 96-5p ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment."); *see generally Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."). Thus, the ALJ's reasons for discounting Dr. Smith's opinion are easily traced in this instance. *See Books*, 91 F.3d at 980 ("All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." (citation and internal quotation marks omitted)); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).

Despite the ALJ's thorough analysis, Knight raises several specific challenges to the ALJ's discounting of Dr. Smith's opinion of her limitations. First, she contends that the ALJ inappropriately "played doctor" when he discounted Knight's assertion that the stress of work activity causes her hospitalizations. (Tr. 379, 390-93.) Why Knight advances this particular argument in connection with Dr. Smith's opinion is unclear, as the ALJ cited this reasoning when discounting the credibility of her subjective testimony about the cause of her hospitalizations, a finding which she does not challenge on appeal, rather than Dr. Smith's opinion of disability. (*See* Tr. 16-17, 19-20, 26.) In fact, Dr. Smith never specifically opined that

the stress of Knight's employment led to her prior hospitalizations.[6] (*See* Tr. 21, 24-25.) Rather, his documentation suggests that her prior hospitalizations were more connected with medication management, stating in November 2007 that "she had a number of hospitalizations . . . approximately every two years *until Dr. Fawver got her settled with Lithium*." (Tr. 371 (emphasis added).)

In any event, Knight's assertion that "no medical opinions in the record" support the ALJ's observation concerning the events that reportedly precipitated her prior hospitalizations is misplaced. (Opening Br. 16.) Upon discharge from her October 1996 inpatient stay, Dr. Fawver documented that during the month preceding her admission she reported "increased stress with her husband leading to a manic episode". (Tr. 173.) Likewise, as to her September 1998 admission, the medical documentation reflects that she had been reducing her medication on her own. (Tr. 185, 188.) And, though the discharge summary relating to her first June 2000 admission does mention some work stress, it more particularly states that Dr. Fawver had been reducing Knight's medication prior to her admission and she had gotten married just two days earlier. (Tr. 195, 197.) In fact, her second June 2000 admission just days later makes no mention of work stress, reflecting again that she had recently married and that alcohol use by her new spouse "may have resulted in increased conflict" and the "new marriage is a significant adjustment". (Tr. 213, 295.) As to her July 2002 inpatient stay, it also occurred "after some medication changes had occurred." (Tr. 231.)

Of course, considering the complexity of bipolar disorder, at first glance the ALJ's

---

[6] While Dr. Ciula, the physician who evaluated Knight upon referral by her attorney, did specifically opine that Knight's job-related stress caused her past episodes of decompensation, Knight does not challenge the ALJ's discounting of Dr. Ciula's opinion.

attempt to seemingly pinpoint a primary trigger to Knight's episodes of decompensation raises some concern. *See generally Richardson v. Astrue*, No. 1:08-cv-142-SEB-DML, 2009 WL 799543, at *3 (S.D. Ind. Mar. 23, 2009) (recognizing the "complex and episodic nature of bipolar disorder"). However, here the ALJ discussed this line of reasoning only in response to Knight's assertion that the primary cause of her past decompensations was her stress on the job. Accordingly, the ALJ correctly emphasized that the medical evidence actually pointed to factors other than work stress as the precursors to her various hospitalizations. He also found it very significant that despite suffering from bipolar disorder during her entire adult life and experiencing intermittent episodes of decompensation, Knight was able to successfully maintain employment as a certified nursing assistant or home health aide for more than twenty years.

Knight also disputes the ALJ's observation that medication instability, whether as a result of her own noncompliance or her physicians' medication management difficulties, contributed to her past episodes of decompensation and that medication instability was not present in the medical record during the last five years. In that vein, Knight argues that "all of the medical opinions of record find that she is compliant with medications" and that even when alleged medication problems occurred, her medications were at therapeutic levels. (Opening Br. 2.) However, as stated earlier, though the records indicate that Knight was generally compliant with medications, she admitted in connection with her 1998 hospitalization that she had been cutting back on her medications on her own prior to her admission. (Tr. 185, 188.) Therefore, the ALJ's reference to medication noncompliance is grounded in the record.

Furthermore, the ALJ observed that the medical records indicate that Knight has been stable on her current medication regimen since 2002, so much so that Dr. Smith did not change

her medications when he resumed her care from Dr. Murphy in 2007. Therefore, though Knight contends that her lack of hospitalizations in the past five years was primarily due to her quitting work in 2002, the ALJ reasonably inferred that her mental stability over the past five years may well be attributable to the medication regimen that was started in 2002, particularly considering the fact that work stress was rarely mentioned in her past medical records. *See Stevenson*, 105 F.3d at 1155 (acknowledging that an ALJ is entitled to make reasonable inferences from the evidence before him); *Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993) ("We must affirm the ALJ's decision if his findings and inferences reasonably drawn from the record are supported by substantial evidence, even though some evidence may also support [the claimant's] claim."). The ALJ reasoned that despite significant continued stressors in Knight's life after quitting work in 2002, including her husband's continued alcohol abuse, his fourth DUI charge, the loss of his license and their automobile insurance, and his quitting his job and losing their medication insurance, Knight remained stable on her current medication regimen, which the ALJ reasonably considered to be evidence of its effectiveness. (Tr. 22); s*ee Stevenson*, 105 F.3d at 1155.

Finally, Knight argues that the ALJ erred when concluding that Dr. Smith was not a "treating source" because he saw her four times during a six-month period in 2002 and three times in an eight-month period in 2007 to 2008. The Commissioner does not zealously advocate this aspect of the ALJ's reasoning, *see* 20 C.F.R. § 404.1502, but instead points out, and rightly so, that even if the ALJ was unreasonable in reaching this conclusion, it would not affect the outcome of his decision. *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination). This is because the ALJ also observed that Dr. Smith's records were internally inconsistent in certain

respects, as well as inconsistent with other opinions of record. *See, e.g.*, *Deacon v. Barnhart*, No. 02 C 6291, 2003 WL 22494911, at *7 (N.D. Ill. Nov. 4, 2003) (finding plaintiff's argument that the ALJ should have considered a physician as a treating source not pivotal where the physician's opinion was inconsistent with other evidence).

As explained earlier, when a treating physician's opinion is inconsistent with other evidence of record or internally inconsistent, it is not entitled to controlling weight and must be weighed according to the factors set forth in 20 C.F.R. § 404.1527(d) like any other non-treating medical opinion of record. *See* SSR 96-2p; *see generally Mote v. Shalala*, No. 3:94-cv-420RP, 1995 WL 358636, at *15 (N.D. Ind. May 12, 1995) ("It is not necessary, or even practical, to draw a bright line distinguishing a treating physician from a non-treating physician. Rather, the relationship is better viewed as a series of points on a continuum reflecting the duration of the treatment relationship and the frequency and nature of the contact."). Here, the ALJ did exactly that, as he considered Dr. Smith's specialty, the frequency and duration of his visits with Knight, the supportability of his opinion, and its consistency with other evidence of record.

And, of course, the ALJ properly did not give any special significance to Dr. Smith's conclusion that Knight was "disabled", since this is an issue reserved to the Commissioner under 20 C.F.R. § 404.1527(e)(3). *See* SSR 96-5p. Therefore, because the ALJ correctly observed that Dr. Smith's opinion was inconsistent with other evidence of record and some of his own records, the fact that he did not consider it a "treating" opinion is harmless. The ALJ weighed the opinion with respect to the factors articulated in 20 C.F.R. § 404.1527(d), which is the proper procedure to address a non-treating physician's opinion or a treating physician's opinion that is

internally inconsistent or inconsistent with other evidence of record.[7]

Of course, ultimately it is the ALJ's responsibility to resolve conflicts in the medical source opinions, *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000), and that is exactly what the ALJ did here. *See Books*, 91 F.3d at 979 ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence.") (citation omitted). He considered that Dr. Bundza, Dr. Shipley, Dr. Kepes, and Dr. Larson all opined that Knight had only mild limitations arising from her bipolar disorder, and that Dr. Smith and Dr. Ciula considered her to have more severe symptoms that precluded employment. (*See* Tr. 19-26.) The ALJ also noted that Dr. Murphy, who treated Knight for four years after her alleged onset date, declined to offer any opinion about her limitations for purposes of her DIB application. (Tr. 22.)

The ALJ then considered this array of medical evidence together with the other evidence of record, including Knight's performance of daily living tasks, her twenty-year work history,

---

[7] Knight also argues in her reply brief that the ALJ erred by finding that Dr. Smith's opinion was not supported by objective medical evidence. However, she mischaracterizes the ALJ's reasoning in this respect. The ALJ stated that Dr. Smith's one-sentence statement of disability in October 2002 lacked support of objective medical evidence (Tr. 21), but he never extended this reasoning to Dr. Smith's 2007 or 2008 medical records. Indeed, Dr. Smith's cursory statement of disability in October 2002 lacks the support of objective clinical findings, as the objective findings that Knight cites to in making this argument are from 2007 and 2008. (*See* Tr. 280-86; Opening Br. 17 (citing Tr. 365, 368, 372, 375)); *see* 20 C.F.R. § 404.1527(d)(3) (stating that greater weight is given to a physician's opinion that is supported by objective medical evidence); *Smith v. Apfel*, 231 F.3d 433, 441 (7th Cir. 2000); *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999).

Knight also conclusorily asserts in her reply brief that the ALJ did not cite any evidence that "Dr. Smith's opinion was inconsistent with his own treatment notes and with those of Dr. Murphy." (Reply Br. 5 (citing Tr. 21).) But again Knight's assertion is without merit, as the ALJ specifically found Dr. Smith's reports in 2007 and 2008 that Knight was in "partial remission", had good judgment, pleasant affect, and no recent mood swings of major magnitude, inconsistent with the GAF score of 25 that he assigned. (Tr. 24.) The ALJ also found Dr. Smith's opinion of disability inconsistent with the level of functioning and stability that Knight had maintained during her four years of treatment and medication management with Dr. Murphy. (Tr. 23-24.)

and her medical stability over the past five years, and arrived at an RFC limiting her to simple, routine, repetitive tasks with no fast-paced or strict production requirements and only occasional interactions with others.  Thus, the ALJ did indeed craft an RFC that accommodated many of the limitations ascribed by Dr. Smith in his June 2008 opinion.

In the end, Knight's arguments on appeal concerning Dr. Smith's opinion essentially amount to a plea to this Court to reweigh the evidence in the hope that it would come out in her favor this time.  Her plea is indeed understandable.  Nonetheless, "[i]n order to be found disabled, a claimant must show that the functional limitations resulting from [her] impairment are so severe as to prevent [her] from performing *any* work." *Shea v. Halter*, No. 00-C-721-C, 2001 WL 34377324, at *7 (W.D. Wis. Apr. 26, 2001) (emphasis added).  This Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" concerning the severity of Knight's symptoms. *Cannon*, 213 F.3d at 974; *see also Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) ("[w]eighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do"); *Clifford*, 227 F.3d at 869.  The ALJ thoroughly considered Dr. Smith's opinion and built an accurate and logical bridge between it and his conclusion, and his conclusion is supported by substantial evidence.  Consequently, the Commissioner's final decision will be affirmed.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The

Clerk is directed to enter a judgment in favor of the Commissioner and against Knight.

     SO ORDERED.

     Enter for this 2nd day of March, 2010.

                         S/Roger B. Cosbey

                         Roger B. Cosbey,

                         United States Magistrate Judge